Thank you, Your Honor, and may it please the Court, my name is Jason Rylander and I'm with Defenders of Wildlife. With me at council table is Lisa Belenky with the Center for Biological Diversity, and we also represent the Sierra Club in this action. I would like to reserve, with the Court's permission, about three minutes for rebuttal. I'll help you keep an eye on the clock. Thank you. The Endangered Species Act and the National Environmental Policy Act require comprehensive review of the effects of federal actions on imperiled wildlife and the environment. In this case, the Bureau of Land Management granted North Sky River Energy a rights-of-way for road and transmission lines as part of a project development for wind in that region. The Bureau initially planned to complete Section 7 consultation under the Endangered Species Act and NEPA compliance as well, as was recommended by the U.S. Fish and Wildlife Service and the California Department of Fish and Game because of potential impacts to the critically endangered California condor, southwestern willow flycatcher, federally protected golden eagles and other migratory birds. Mr. Rylander, doesn't this case turn on whether or not the BLM's decision was arbitrary and capricious when it determined that the right-of-way request was not interrelated with the wind energy project? Yes, Your Honor, it does. But the feasibility of the private road alternative in this case neither deprived BLM of its discretion to influence the project for the benefit of species or change the fact that this right-of-way was the way by which this project was constructed and continues to operate. But if there was a feasible alternative, even though it was three times longer and would have required far more expenditure and would have been more harmful to the environment, the question is, was it within the discretion of the agency to make that call that it was a feasible alternative? And if so, then the projects are not interconnected. Isn't that the analysis that we must apply? Well, there are a couple of responses to that, if I may. That view of causation, we believe, is much too narrow for a couple of reasons. First of all, we do question whether the private road option was feasible for a number of reasons in the record. As you noted, it would have taken longer. It would have cost more. It would have required negotiation with numerous private landowners. But at the end of the day, we don't believe the feasibility really matters because the project was done this way, and so it was the but-for cause of the project. One way to look at it is the Restatement of Torts explains the but-for concept this way. And it says that if an action accelerates the way in which a project is done and the effects thereof, then that can be the but-for cause. And there's an example that they give of a terminally ill patient who accidentally electrocutes him or herself in the bath. No one would argue that the cause of death was anything other than the electrocution, even though they would have died anyway. It would also lead to the somewhat extreme result that any time a private developer had some other way of doing a project, that they could escape any federal environmental review. Well, but we're not talking about the project itself. We're talking about access to the project. And the only decision that the BLM was asked to make here was whether or not to grant an easement or a right-of-way across federal roads in order to reach the project. We actually do not believe that this was simply a way of reaching the project. We view this as a unitary project for a couple of reasons. Is it your position, then, that the BLM had the authority to take regulatory action on the project itself, to impose conditions on NorSky as to how it would operate its wind turbines? It is our position that under 402.02, the regulations relating to consultation, that federal agency actions in whole or in part require consultation. And that, by definition, requires that one would have to consider the effects of the entire project. I don't think you're answering my question. I'm sorry, Your Honor. The question is, does BLM have the authority to tell NorSky, under the rubric of granting an easement over federal land, how it's going to operate its wind energy project? I'll answer directly, yes. And the reason they have that authority is because they can condition the right-of-way or they can deny the access road entirely and the transmission lines that would result from it. Well, aren't we back to the question I asked you earlier, which is, if the federal right-of-way is not the only way to reach the project, wouldn't NorSky's response to the proposed condition by BLM be, well, thank you very much, but we choose not to use your roads, we're going to go talk to the private landowners and develop the private road to get there? And in that case, you would agree, would you not, that BLM would have no right to influence the operation of the project? Assuming that the private land road was feasible and NorSky chose to develop the project that way, then Section 7 consultation would not apply because there would no longer be any Federal action in whole or in part. They would still be able to do that. Let me ask you another question, and maybe I should have asked you this earlier. Is this case now moot? As I understand it, the project is in operation. It's generating electricity. The right-of-way has been granted. What is it that you want us to order by way of relief here? Yes. This case is not moot, and there's a long line of cases from this Court that speak to this precise issue in both the Endangered Species Act and the NEPA context. That would include Feldman v. Bomar, the Columbia Basin Land Protection Association v. Schlesinger, and more recently, the Center for Biological Diversity v. the Bureau of Land Management in the Ruby Pipeline case. Okay. But I'm asking you a very specific question. What remedy are you asking us to do? The remedy that we are asking you to do is to remand the case back to the district court and with an order that Section 7 consultation be completed and that NEPA evaluation be completed on this project. And the reason why that's the case is that the NEPA has a right of way that is a permit, and that grant is in the record. Can the agency, in essence, rescind? Does it have the contractual right to rescind the right-of-way that it has granted? The right-of-way grant is a permit, and that grant is in the record. The Court could order vacation of that Federal action pending the completion of the contract. So it's just a permit? There is no actual easement contract that grants the company, I don't know, say, 40 years or 100 years' use of the right-of-way? Well, the right-of-way allowed them to build a road and then maintain transmission lines on the property. I don't recall the length of the term of that, but it was — a right-of-way is precisely the kind of an action that is contemplated on the property. The question that I think we grappled with in some of the Delta cases, and that is whether or not the Bureau of Reclamation in that case had the contractual right to go back to the original water users and change the terms of the contract. That's the basis of my question. And we think this case fits very squarely within the precedent of this Court in both Carobtri case and the NRDC v. Jewell case that Your Honor is just mentioning. But what does the contract say? That's what I'm trying to get at here. What rights does NorthSky have at this point to continue using the road? Well, the question was what rights did they have at the beginning of the process when they yielded. No, no. My mootness question goes to what remedy we can order here. What is it that the BLM would be able to do under the condition that exists now with a right-of-way having been granted? Well, there are two answers, and I'll try to answer as directly as I can. The first is that I do believe that the BLM has the authority and this Court has the authority to rescind that right-of-way. That would have the effect of cutting off the transmission lines for the project. That is one. So we can tell the government this contract is null and void and essentially order the parties back to status quo, NorthSky, you've got to stop the propellers and stop running electricity through the cables until you complete consultation. Is that the relief that you're asking us? That is not necessarily the relief that we're asking for. That is a relief that you have the power to do, and it is one of the reasons why this is not moot, but it is not. By what authority do we have the power to do that? Just because we're a Federal court? By the authority granted under the Endangered Species Act and under TVA v. Hill and many cases of this Court that grant injunctive relief for substantive violations and procedural violations of the ESA. But I thought the case law was that if we don't have the, that the, if the agency doesn't have the right to dictate the terms of private activities, where, what statutory authority gives us the right to interfere with a contract that the Federal government is already obligated to perform? It's my argument that the agency does have that right, and that is a right that was recognized in Carrick Tribe and in NRDC v. Jewell for direct actions. But this Court has also ruled most recently in the San Luis and Delta v. Locke case that where there is private activity, it may also be an indirect effect. And because this, in that case, it also, the Court held that 402.02, because it does speak to this in whole or in part language, and it also finds indirect effects as causes that may be later in time and reasonably foreseeable. That direct cause is not the case. The Bureau of Reclamation, which operates the pumping stations, has the authority under existing contracts to vary the amount and the timing of the water that's being delivered. I'm still looking for an answer to my question as to what the agency can do. I understand what you want us to do. You want us to basically restore the parties to the status quo, and I don't see how we can do that given what has happened to date. Well, Your Honor, let me be as clear as I can. I do not believe that it is necessary, and certainly not our intent, to shut down this project. It was our intent that the proper environmental review be done, and it can still be done, and a consultation could still result in operational changes to this project. And Fish and Wildlife Service in the record pointed to a number of ways in which the operations might, after consultation On pain of what? On pain of a threat that we will rescind the permit. I'm — I mean, the district court, I think, put it colloquially, you know, playing a hand of poker, and although I think that may be a bit of an exaggeration, there is some truth to what Judge Ishii was talking about. Yes. Now, here's a couple of responses, if I may. Now, I'll get to the poker analogy in just a second, because I actually think that cuts our way. But the way Section 7 actually works, and this sort of bargaining occurs all the time in Section 7 consultation, right? So if, at the completion of consultation, the Fish and Wildlife Service recommends reasonable and prudent measures that may influence the project to the benefit of the species, they become part of an incidental take statement. That incidental take statement also functions, in essence, as a contract that is enforceable by the U.S. Fish and Wildlife Service. So if consultation were to occur at this point, whether or not BLM chose, which I believe it has the right, to withdraw the right-of-way, the incidental— You keep saying that, but yet you don't tell me what the terms of the contract are. You don't even know its duration. You don't know what the government's obligations are. I mean, it seems to me if I were involved as a lawyer in that transaction, I'd want some certainty on behalf of the recipient of the easement that I could continue to have access to my project site in order to transmit electricity along that right-of-way for quite a period of time before I invested hundreds of millions of dollars into a wind farm. And they would have had that certainty had the Bureau of Land Management not violated the law by skipping its responsibilities. Well, they got the permit, though. That's the problem. They now have that contractual right. And if we were to remand it, I'm still puzzled by what remedy it is that you're asking for other than further negotiations. But I don't see how those negotiations could result in conditions being imposed on North Sky as a condition of continued use of the right-of-way. They would be imposed via an incidental take statement developed by the Fish and Wildlife Service that would also provide them with take protection for any species that they kill or injure as a result of the project. As it is now... You're using the term project, and I guess you and I are talking past one another because I'm having a hard time envisioning the project as more than the opening or improvement of the road and the trenches that were dug to lay the transmission and the fiber optic cable. This project was initially envisioned to include 130 wind turbines on Federal and private land with a right-of-way and a transmission line. Okay. So we do view it as a unitary project. But they abandoned the Federal portion and scaled the project back so that they only have wind turbines on private land. Yes, but the road would not have been built but for the project, and it is our assertion. Well, that's – I mean, it's kind of a circular argument. If we disagree with that premise, if we rule that the agency was not arbitrary and capricious when it found that the private access was a feasible alternative, then the project is strictly limited to an easement across Federal land. Even assuming that the road was feasible, then we are in a question of whether there was an indirect effect or a interrelated or interdependent action going on here. And in the San Luis case, VLOC, this Court cited approvingly the National Wildlife Federation B. Cullman case from the Fifth Circuit where highway interchange was to lead to much later private development. Now, surely that's not a direct cause, and surely the agency did not have immediate authority over those projects, but it did have the responsibility to review them. And even in the Medina case that defense counsel cite, they there admitted that even though the – well, the issue there was a railroad. And consultation occurred in that case. Alito, let me ask you, I thought you told me earlier that if the projects were not interrelated, then BLM would have no authority to regulate the activities on the project, on the wind towers. If they were not seeking a private permit or private authorization and there was no Federal action, as this Court has defined it in NRDC v. Jewell and Carrick Tribe, then, of course, we're dealing with an action of which the Federal government has no authority. The fact that they are seeking public benefits means that they have to follow the public's rules. Okay, but now what I hear you arguing is that even though that may be so, there still is an obligation under the Endangered Species Act enforceable not by BLM but by the Fish and Wildlife Service that would have some impact here on what North Sky's obligations would be. That is correct. But Fish and Wildlife is not a party to this action, is it? They are not. Well, how do we get there from here? You order them back to consultation, and a consultation occurs. The only party that's before us right now is BLM. Yes. BLM is the action agency that is required to seek consultation with the Fish and Wildlife Service whenever there are actions that it But I thought what I heard you arguing was that it's now as between the Fish and Wildlife Service and North Sky, not BLM. Am I misunderstanding your argument? Well, no, not exactly. I mean, there's no difference between this and the private miners in Carrick Tribe who are going to have to alter their activities because consultation found that they were going to have an impact. But in that case, they needed a permit from the U.S. Forest Service, which they didn't have yet. Here there is a permit that's been issued. Well, I mean, we may be going in circles. You got about three minutes left. Okay. Do you want to answer my question or just reserve your time? 402.02 says any action in whole or in part, and it clearly seems to contemplate that. And the indirect effects test and all these other ways of viewing this project, connected actions under NEPA, all suggest, Morgan B. Walter suggests, that private activities may be part of this analysis, whether it's under NEPA or whether it's under the ESA, if a federal agency is going to take an action that could accelerate or impact in some way endangered species. And that's fundamentally where we are on the case. Sotomayor, may I ask you, did your client request a stay pending appeal? We did not request a stay pending appeal. At that point, the project was already constructed. We did seek a preliminary injunction, and then what happened was the judge, the initial judge transferred the case to Judge Ishii. We lost about three to four months in the course of that and moved for expedited summary judgment. We briefed the case then, and the opinion below was the result. But you abandoned your request for an injunction. We abandoned the request for the injunction at that point because the project was already substantially completed. But it's completed now, so that's why I don't understand your argument that there is something that can be done now. It would have been more prudent to seek a stay pending appeal when the project was in its infancy as opposed to now. By the time Judge Ishii had ruled and shortly the project was built. But there are many, many cases from this Court that have held that cases like this are not moot and that the Federal Government cannot avoid its responsibilities under the ESA and NEPA and then claim later, sorry, the project is done, we don't have to do it. And that's almost. You're not, maybe you are, but let me ask, you're not asking to shut down the project. We are not asking to shut down the project. We are asking that the review that was supposed to have been done before it was built be completed. And if that results in some operational changes, then that will benefit species and it will satisfy the BLM's obligations under Federal law. If I may reserve the rest of my time. Thank you. Thank you. Well, I understand the Respondents are dividing their time. Is that right, Mr. McFadden? Yes, Your Honor. I'll go first. I'll speak for approximately 13 minutes and the remainder of my time I'll be seated to. I'll try and help you. Thank you. I appreciate that. I may need it. Good morning, Your Honors, and may it please the Court. My name is Lane McFadden. I represent the Bureau of Land Management and the Federal Appellees. With me at the council table are counsel for the interveners, Mr. Dan Dunn and Ms. Jennifer Beaver. Your Honor's questions about the potential mootness of this case and the failure of the plaintiffs to identify any viable remedy that remains in this case all get to the underlying premise of why it is that the BLM did not engage in unnecessary NEPA or ESA review of a project for which it provided no funding, required to give it no permits or technical assistance, and which in fact had zero Federal involvement. I want to cut tight to the heart of it, because as I read this, this is what I surmise. There was extraordinary time pressure. There was an initial reaction by Fish and Wildlife and your client that suggested that the private alternative was not particularly viable. There was an about-face, and the right-of-way was provided. Fish and Wildlife essentially ignored. If we — if in trying to decide whether it acted arbitrarily or capriciously, we have to look for the reasons why. Okay? Now, during the comment period, you said the Fish and Wildlife — the private land access alternative, alternative B, was analyzed to provide a comparison of the potential environmental impacts, et cetera, et cetera. Analyzed. How do we determine whether or not you acted arbitrarily when we — there is no analysis before us. There's none. Where is the analysis? How do we make that judgment? It appears that the private road was woefully difficult and probably so expensive. One has the sense that that private road was never realistically on the table. Is that all it takes, just articulate a private way around the Federal regulatory scheme and that's — and you're home free? Where is the analysis? How do we make a judgment as to how they — or do we simply accept it? Is that what we do as a reviewing court? We simply accept that the Bureau has decided that the private road is viable, therefore it's none of our business. I don't get it. The Honor, there are two different places in the record where the road is analyzed for different purposes. Of course, its potential environmental impacts were analyzed as alternative B in the environmental assessment, which discusses what would happen in a world where that private route was chosen and constructed and developed by NSRE. Then there's a separate analysis about whether the private road could be built, whether it's technical and engineering feasibility — sorry, it's viability. You can start at Supplemental Excerpts Record 482. It's a technical memorandum which describes in detail how this road could be built, then proceeds to provide several pages thereafter, stamped engineering diagrams of the actual route and how it would be constructed. This information was provided sort of halfway through maybe towards the fall of 2011 after the correspondence Your Honor referred to in which there was initial statements by NSRE that they would have an alternative route, but BLM didn't at that time have the details of what or where it would be. Once BLM had those details and saw that it was viable, BLM exercised its expert judgment. It is, after all, a land management agency, and determined that this was a feasible alternative, and that was, of course, an important factor in its decision-making. And that's all it takes to take this out from under a Federal scrutiny, is for the Bureau to simply say it was feasible. Bearing in mind that it takes — it doesn't remove the wind project from Federal scrutiny. It was never subject to Federal scrutiny. They never needed a permit. They never needed the permission of the BLM to place their wind turbines. The plaintiffs have attempted to find a way to impose Federal responsibility over the wind project, but there is no statutory authority for that responsibility. The BLM is governed by the Federal Land Policy Management Act, FLPMA, which governs its grants of right-of-ways. It has a lot of authority over the way that right-of-way can be built and used and where and how, but it has no authority over activities that take place off the Federal lands. FLPMA doesn't give it that authority. And when it doesn't have that power to act, the Supreme Court has said that there is no — there's no purpose to requiring it to analyze effects. It cannot prevent and cannot affect. And the plaintiffs were asked today very directly, what authority does BLM have to prevent or prevent those impacts at the wind project? And the answer given was, well, it could place conditions on the right-of-way or it could have denied the permit. But in this case, the BLM considered those options. And indeed, it does have the authority to deny permits such as these. But had it done so, the result would not have been that the wind project was not built. It would not have prevented whatever the perceived adverse environmental effects of the wind project would be. That's the point. Sotomayor So we just accept the developer's representation that if you don't give us the right-of-way, we'll build the private road? No, Your Honor, which is why you see those letters from Fish and Wildlife Service earlier in the year from BLM when there was the bald representation without the documents to back it up, the agencies were appropriately skeptical of that. And if that – if the record contained only the bare assertion that there was another way, then you might find the agency's determination arbitrary and capricious. What information did you garner that changed your mind so suddenly, frankly? The technical memorandum, it's at 482, and then the accompanying maps and engineering designs are stamped by civil and environmental engineers. But the maps don't tell you anything in terms of the viability or the feasibility of that private road. Well, what is it – what more would Your Honor would like to know about the viability of the private road? Well, let's talk about the cost. Was there any strong – was there any detailed analysis of the cost? The record contains no detailed analysis of the cost. None. None, for the following reasons. There is no regulatory requirement to assess costs in that – with that level of detail. There are, of course, regulatory requirements that the BLM assess the costs and the financial capability of a right-of-way applicant. And so it had to determine whether NSRE could afford to construct and maintain properly this right-of-way. But there is no legal requirement for it to assess whether an applicant or what – here they weren't an applicant for the private route, which is the reason the regulations don't apply to the private route. There was no legal requirement to open the books and determine whether this corporation could afford to build this road. But there was no evidence before the agency that it would not be able to afford that. And there has been much doubt cast by the plaintiffs, of course, well, it's adjacent to an awful lot of parcels of land, 136. But bear in mind that this is a company that had already purchased 12,000 acres that was divided into 480 parcels of land to build its wind project. There was never any suggestion by anyone, including the plaintiffs during the comment period, that NSRE could not afford economically to build its private route. Had BLM been asked that question directly, it would have responded and the administrative record would then contain that information. Sotomayor, would it be fair to say that they wouldn't have been able to build the route and get the project underway in time to take advantage of the tax benefits? I don't know that that's fair. I mean, the environmental assessment says it's anticipated that the private route would take 51 days of construction. Had they begun it in a timely fashion, that would have gotten them within the window for the tax benefits they were looking for. Bear in mind, as we mentioned in the brief, NSRE did come to the BLM and said we want an expedited decision because we're trying to get our tax benefits, and the agency said no. We will make this decision in due course, and it added milestones, and it did not meet NSRE's requested deadlines of September 2011. The record supports the fact that, aspersions aside, the agency did not let the intervener's urgency and, you know, interest in getting this project underway as quickly as possible speed up its process any more than it needed it to. I want to address the answer given earlier today that on remand, the Fish and Wildlife Service could require an incidental take statement for the wind project. I mean, that is not true under Section 7 of the ESA. Of course, under Section 10 of the ESA, NSRE could of its own accord come to the Fish and Wildlife Service and negotiate for an incidental take statement if it anticipates violation of the Endangered Species Act as a result of the operation of this wind project. It has not done so. It is currently subject to the civil and criminal penalties available in Section 9 of the Endangered Species Act, and if it violates the Endangered Species Act, those penalties apply and can be enforced against NSRE. I don't want the Court to have the impression that the Endangered Species Act is not currently in effect or protecting the species at this project. That is the way Congress set it up. We're talking about, obviously, migratory birds. We're talking about endangered species like the California condor. And there are separate civil and criminal provisions that I assume would apply if it is determined that this project is engaging in those kinds of takings, is it not? Well, I mean, those are the provisions of Section 9 of the ESA, and then separately the Bald and Golden Eagle Protection Act has its own penalties, and they apply currently. I mean, they're currently applicable to the wind project, and any violation of that that occurs this afternoon or tomorrow is subject to penalties under that statute. Those are, you know, those are civil and criminal penalties that are enforced by law enforcement. The suggestion, however, that on remand this Court could ask NSRE and the Fish and Wildlife Service to enter into consultation under Section 7 presumes, of course, that the plaintiffs are entirely right about whether the wind project was a Federal action in the first place, because Section 7 only applies to those Federal actions, and it requires the action agency here, the BLM, to consult with the Fish and Wildlife Service, and there they might develop an incidental take statement, or they might not, depending on what risk to the species is found to be likely. You know, it's not the inevitable result of a Section 7 consultation. It's one thing that happened. Mr. Rallender was unable to answer my questions with regard to whatever the contractual obligations are as between BLM and North Sky. Can you enlighten us? I'm afraid I don't think the contract itself is in the record here. It's certainly not excerpted, so I don't have it in front of me today. I'd be happy to provide it. But there is a contract, I assume. There is a contract. It grants a 30-year period of or possibly 40-year period of use to NSRE, and it has the standard provisions that it can be rescinded for violations of the law. But there is nothing in it that I am aware, and these contracts don't normally contain a provision that, you know, on reconsideration of the already granted right-of-way, the agency might change its mind and revoke it for that purpose. You know, a remand for further NEPA evaluation of the LEND project would do what this Court said in California Trout would be nonsensical, which is to duplicate the environmental review already contained in the 2,000-page EIR performed by the State to the extent that the public needs to have the potential impacts of the LEND project disclosed. That purpose has already been served.  Ginsburg-Gillian, are you implying that the NEPA obligations and the obligations under the ESA can be met by a State study? No, Your Honor, I'm not. I'm simply pointing out that as a matter of remedy in this case, this Court has already said in cases like Sylvester v. the Corps of Engineers that it takes great comfort to know in a NEPA challenge that the work of NEPA documentation and the disclosure of impacts has already been done under some other process, and that has guided in the past this Court's decision-making. I think it's important to bear in mind here when thinking about remedy. As to the ESA, you know, the BLM's authority over the LEND project to impose terms and conditions in the LEND project is essentially there has been no source of authority identified for that. It could have denied the right-of-way permit, but that ship has sailed. And in any event, at the time that it made that decision, that was a very reasonable decision because its choice was let the LEND project go on anyway with this private route, or gain some benefit to the public land and grant a right-of-way which is consistent with our FLTMA obligations and our other both secretarial and executive order policies. So if I understand your position correctly, because of the fact that the permit has now issued, BLM has no residual authority to revoke the permit and begin imposing conditions on North Sky? By and large, that is true. I mean, it's bound by the terms of the permit. It can, of course, monitor for compliance in terms of the permit, and the permit has all sorts of terms and conditions. There's a fugitive dust management plan and all sorts of environmentally sensitive areas that would be devoided at certain times or during construction. You know, the permit has its own set of environmental protections, and they have to comply with those. But I, bearing in mind I don't have the language in front of me this morning, I don't believe there's any means that BLM could simply revoke it. And so you would be asked to remand this case simply to, you know, to ask for a duplication of effort on the NEPA side and a consultation that can't really be engaged unless NSRE comes forward with its own accord under Section 10, which it can do without any sort of remit. Is your position that the case is moot because there is no effective remedy? Though we did not argue moot, there isn't an effective remedy. I see the cases cited by the plaintiffs here were all cases where it was remanded for consultation on a Federal action, and, of course, that can lead under Section 7 to litigation. The reason I asked Mr. Rylander about the Delta smelt cases is that I recall that even though the Bureau of Reclamation had contractual obligations with regard to the timing and amounts of water that would be delivered, and also as to the pricing, which could effectively be invoked in order to condition benefits for the endangered species in that case, but as I understand the record that is before us, the road has been improved, the trenches have been dug, cables have been laid, the trenches have been I agree, Your Honor. Your description of the two cases is correct. BLM lacks authority on remand to impose conditions on the wind project, no matter what the result of any further NEPA or ESA consultation might be. I see I should have stopped you earlier, but sorry, I should sit down. So there is absolutely no value in requiring a full environmental impact statement. We have nothing to learn. There is no value in terms of how you monitor the operation of your right-of-way. Right-of-way, I assume, is subject to law, as you said earlier. So we would gain nothing by a consultation with Fish and Wildlife. We would gain nothing by a full environmental impact statement, understanding that the project is there, it's ongoing, it will not be stopped. In this specific scenario, Your Honor, that is correct. No value whatsoever. Because the BLM does not have the statutory authority to make changes to the wind project. That is the reason why this is the case in this very particular set of facts. Thank you, Your Honor, for your questions. Thank you, Mr. McFadden. Good morning, Your Honors. May it please the Court, I'm Dan Dunn. I'm for the Defendant Intervenor, North Sky River Energy. Judge Deary, I want to go right to your question that you asked about what needs to be shown in the record to demonstrate feasibility. Because, you know, frankly, that is a central subject that I've spent quite a bit of time knowing that it was going to probably come up today. And I want to talk you through that, if that's okay. First, my client, there is a form called 299 that you have to use to apply. And if you look at the record at page, I'm not finding it now, but there's a form. Do you have the technical, do you have the financial capability to build the project? The answer to that question was, my client's parent is a $15 billion revenue company in 2007 with 17,000 megawatts of electricity, 25 states, in Canada as well. Now, that's in the record. But the most important point, I think, in this Court's cases, Great Basin Mine Watch and the Blank case, which we cite, I think, at page 24 of our brief, when evaluating whether connected actions exist under NEPA, the record only needs to demonstrate that the road or the wind project, I should say, the alleged connected action, reasonably might have proceeded without the right of way. That's all that's required. Those two cases are critical. In this case, BLM had before it a host of information about my client's ability to construct. And this is where we're going to get into a little bit of the history, because there's a story here that when you read the briefs, you have to be able to look at the record and tease out. And that's what I'm going to do in the 1 minute, 27 seconds I have. First, January 2011 is the first mention in the record about this non-federal route. Fast forward to May of 2011, I mean, April of 2011, my client hires an engineering firm to do detailed design drawings, construction details, with a hundred notes about how to go about it. Most of the road from the west, the non-federal route, was along an existing county road. So the cost, you know, query how much it would have been. There was no way my client was going to walk away from this investment when it paid so much money to buy over 12,000 acres. It, that's its business, is to go out and get easements and figure out how to get access. So we did have the ability to do that. And just keep in mind, it's only the test is, might it reasonably have been completed, our wind project, but for the right-of-way. And, you know, the- Without putting your project aside just as a matter of law, if you would, that, if the word is might, if that is indeed the state of the law, that's a, that provides developers with a rather facile and easily, an easy way around federal regulation, doesn't it? Isn't that a little disconcerting? I mean, we have all of these environmental statutes. We have the burdens put on these agencies like that. And all we have to come up with is an articulable alternative that might be available. That's the state of the law? No. It might reasonably be completed. And this is, this is important. It really does go to the heart of your concern. It doesn't require a technical cost-benefit analysis. It doesn't require my client to have given BLM, here's exactly how much it would cost to build this project. We did tell them how long it would take, how it was going to be done, where there was an existing county road. And it was reasonable to assume, given its investment, there is no way, in no way, shape, or form was my client ever going to walk away from the wind project if it didn't get the right of way. That's why, in April, it hired an engineering firm of 2011 to draw up the drawings. Then it submitted those. They weren't construction drawings, per se, were they? Oh, yeah. I mean, you look at those pages. Again, forgive me, I don't have the sites in my mind, but they were construction drawings. And I'm telling you, when you look at the notes that are on those, they're as detailed as you could possibly expect them to be for a project. As I recall, it's right down to which curves need to be expanded and or eliminated if they're too sharp or hairpins. Exactly. And I don't have the exact citations, but it's in our brief. And it literally, there are 100 separate really fine notes about how you're going to go about doing this. And again, this was an ex- there was most, almost this entire road already existed along County Road 58. So there wasn't going to be that great of an expense. But another important point is, it is the plaintiff's burden to show that this was not feasible and they have not carried that burden. The pages, what's it say? ER 479 is something that I think contains the drawings. Okay. Thank you. Thank you. Mr. Gunn, I'll let you run over about two and a half minutes. Okay. Thank you. Thank you. Mr. Rylander, you have, I'll give you a couple minutes on rebuttal. Thank you, Your Honor. A couple of points with respect to remedy. If it would be helpful to the Court or on remand for there to be supplemental briefing on that question, that might be helpful. I mean, frankly, from what I've seen so far, it doesn't sound to me like there's much that we could order by way of remedy. Well, Columbia, CBD v. BLM, which is the Ruby Pipeline case, the pipeline was already built, and the Court held that the pipeline was completed and put into service during dependency of this lawsuit does not render Petitioner's challenges moot. In Columbia-Basin Land Protection Association, we said, if the fact that the towers are built and operating were enough to make a case non-justiciable, then the Bonneville Power Administration and all similar entities could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootless doctrine. And there's at least 20 cases. Does those cases involve – it's been a while since I've looked at them – involve right-of-ways across Federal land in order to reach? I mean, part of – I guess part of my concern here is we're talking about a right-of-way, an essentially permission to drive across our land, as opposed to if the project were actually being constructed on Federal land. Right. Well, right-of-way is precisely the type of action that is identified in the regulations as subject to section 7 consultation. But, you know, as the defense counsel, defendant's counsel stated, I mean, it can be rescinded. FLPMA does provide authority. It does require that when BLM issues rights-of-ways, it shall issue them in accordance with applicable law, and it lists various other conditions regarding the protection of the environment. The CBD, the BLM case, again, the Ruby Pipeline case, also talked about the authority of the Fish and Wildlife Service, ultimately, through an incidental take statement to enforce any provisions that would result if BLM were to consult and they were to find that any actions could inure to the benefit of the species. And that's the standard under section 7, not whether it must, but whether it could. And if you're – and if the North Sky wanted to go out and do this project a completely different way, that's their right, but they didn't. They chose to do it this way. They chose to avail themselves of the Federal lands. Section 7 appears to be clear that whether it's an indirect effect or whether it's a direct effect, consultation should have occurred, and it is still possible for consultation to inform this project for the benefit of species. All this Court needs to find is that it could. And I thank you. Breyer, I think we have your argument in mind. Thank you all for a case very well argued. It is now submitted for decision, and we'll let you know if we need anything by way of supplemental briefing. Thank you, Your Honor. We are adjourned.
judges: Dearie, Tallman, Rawlinson